**Wayne WICKS, Petitioner,**

v.

**A.L. LOCKHART, Director Arkansas Department of Correction, Respondent.**

**No. PB–C–81–409.**

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

Aug. 5, 1983.

Robert A. Newcomb, Little Rock, Ark., for petitioner.

C. Randy McNair III, Asst. Atty. Gen., Little Rock, Ark., for respondent.

## MEMORANDUM AND ORDER

EISELE, Chief Judge.

The Court has received a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 from Wayne Wicks, an inmate at the Cummins Unit of the Arkansas Department of Correction. Petitioner's claim that he is being unlawfully incarcerated is based upon the following grounds: (1) The evidence presented at his trial was insufficient to sustain the verdict; (2) The prosecution failed to disclose evidence favorable to the defense; and (3) Petitioner's counsel was ineffective which had the effect of denying to him his right to a fair and impartial jury under the Sixth Amendment.

In December of 1978, petitioner was charged, by an information containing two counts, with having raped the same woman twice, once on August 17, 1978, and again on September 26, 1978. On March 26, 1979, a jury in the Yell County Circuit Court found him guilty of rape, and he was sentenced to life imprisonment. Petitioner's conviction and sentence were affirmed by the Arkansas Supreme Court in an opinion delivered on October 20, 1980. *Wicks v. State,* 270 Ark. 781, 606 S.W.2d 366 (1980). On November 2, 1981, the Arkansas Supreme Court denied petitioner permission to proceed under Rule 37 of the Arkansas Rules of Criminal Procedure. Therefore, petitioner has met the exhaustion requirement of 28 U.S.C. § 2254(b).

After reviewing the state court proceedings, pursuant to Rule 8 of the Rules Governing Section 2254 Cases in the United States District Courts, this Court determined that an evidentiary hearing was needed to further develop the record in connection with the claims of ineffective assistance of counsel and failure of the prosecutor to disclose favorable evidence. The hearing was conducted by United States Magistrate Robert W. Faulkner on May 20, 1982, in Little Rock, Arkansas. Petitioner appeared and was represented by Robert A. Newcomb of Little Rock, while respondent was represented by C.R. McNair III, Assistant Attorney General.

From the testimony obtained at that hearing and from the record as a whole, this court finds that the petitioner's petition for habeas corpus must be granted on the ground that he was denied effective assistance of counsel which had the effect of denying to him his right to a fair trial under the Sixth Amendment. Petitioner's other grounds, however, do not entitle him to relief. Each of the grounds will be addressed below.

## INSUFFICIENCY OF THE EVIDENCE

■ Petitioner first asserts that there is insufficient evidence that he was guilty beyond a reasonable doubt of each rape with which he was charged. In assessing this claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In addition, *Jackson* requires that this Court give great deference to the Arkansas Supreme Court's rejection of the petitioner's claim of evidentiary insufficiency.

Petitioner argues that he was able to establish an alibi for the second rape and that the victim did not report either rape until two weeks after the second attack. He concludes that this raises a reasonable doubt of his guilt and therefore no rational trier of fact could have concluded that he had committed the second rape. The respondent argues that the Arkansas Supreme Court found that the evidence at trial presented a proper question of fact for the jury.

This Court, after reviewing the evidence, agrees with the respondent and finds that the factual issues were properly before the jury. Furthermore, viewing the evidence in a light most favorable to the prosecution, the evidence was clearly sufficient to permit a rational trier of fact to conclude beyond a reasonable doubt that the petitioner committed each of the two rapes charged. Nevertheless, as will be shown below, it is impossible to determine if the jury actually convicted the petitioner on one, both or either of the two separate charges of rape.

## DISCLOSURE OF EVIDENCE FAVORABLE TO THE DEFENSE

Petitioner asserts that the prosecution failed to disclose evidence favorable to his defense in violation of his due process rights. In support of his contention, petitioner relies on the testimony of the officer who initiated the investigation of the rapes, the former deputy prosecuting attorney and his trial counsel. He seeks to establish that the initial identification of petitioner by the victim was unduly suggestive and that the prosecution's failure to disclose the suggestive procedure amounted to a denial of due process.

At the evidentiary hearing, Officer Ottie Talkington, the investigating officer, testified that he interviewed the victim after she reported the rapes. Based upon the description she was able to give of her attacker, Officer Talkington became suspicious of petitioner because he matched the physical description. Later Officer Talkington and Monte Sims, Chief Deputy of the Yell County Sheriff's Department, again interviewed the victim. Officer Talkington testified that he carried a folder containing a single photograph of petitioner and, during the interview, the photograph inadvertently fell out of the folder. He stated that the victim, upon seeing the picture, immediately identified petitioner as her assailant.

The officers were later told by the deputy prosecutor, Tom Donovan, that it was improper to base the identification of petitioner on the viewing of a single photograph. The officers then prepared a photographic spread consisting of nine photographs, including one of the petitioner, which was not the same one the victim had seen earlier. Again, she was able to identify petitioner from the photographs.

Petitioner's claim rests on two theories. He argues first that the single photograph display presented to the victim violated his

due process rights under *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1973). He then argues that the prosecution's failure to inform him of this single photograph identification was yet another violation of his due process rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Petitioner claims that had he known of the identification procedure he could have had the victim's in-court identification testimony suppressed as "tainted" or, alternately, he could have used the information to impeach her identification testimony. The first question this Court must address is whether the single photograph identification by the victim amounted to a violation of a petitioner's due process rights.

*Single Photo Display*

■ At the outset, this Court recognizes the gravity of the identification issue in this case. The outcome of the trial turned almost solely on the identification of petitioner as the rapist. Furthermore, the only identification testimony presented was that of the rape victim. Under Arkansas law, however, the testimony of the rape victim need not be corroborated in order to obtain or sustain a conviction. *Bailey v. State,* 227 Ark. 889, 302 S.W.2d 796 (1957), *cert. denied,* 355 U.S. 851, 78 S.Ct. 77, 2 L.Ed.2d 59 (1957).

■ The United States Supreme Court has recognized the danger of suggestiveness in photographic identifications, particularly when only one picture is displayed and it is of the defendant. *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1967). Such a procedure can result in the witness "retain[ing] in his memory the image of the photograph rather than that of the person actually seen, reducing the trustworthiness of subsequent line-up or courtroom identification." *Id.* at 383–84, 88 S.Ct. at 971. Not all suggestive identification procedures, however, violate due process rights. The proper standard to be applied in these instances was laid down in *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (police station showup), and restated in *Simmons.* It re-

quires that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons,* 390 U.S. at 384, 88 S.Ct. at 971.

■ This Court recognizes that the showing of the single photograph of petitioner to the victim, whether by accident or design, was a highly suggestive procedure. Nevertheless, the suggestiveness of the procedure itself is not sufficient to constitute a violation of the petitioner's due process rights. He must also show that the viewing of the photograph by the victim meets the "substantial likelihood of irreparable misidentification" prong of the *Simmons'* test. The question, therefore, is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers,* 409 U.S. at 199, 93 S.Ct. at 382. That case set forth specific factors to be considered in evaluating the likelihood of irreparable misidentification, including:

> . . . the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199–200, 93 S.Ct. at 382.

■ Applying these factors to the facts presented here, the Court finds no substantial likelihood of a misidentification of the petitioner by the victim. At the trial, the victim testified that her in-court identification of her assailant was based on her having talked with him for about twenty minutes after the first rape. The conversation took place on her front porch, where she sat facing a street light and was able to see petitioner with the additional aid of light from the moon. She was positive in her identification, and stated that she did not know petitioner before the attacks. The

victim also stated that she knew the second attack was committed by the same person because of the identical physical features and the same body odor and voice. Considering the victim's opportunity to view petitioner, the three month time period between the first attack and the viewing of petitioner's photograph was not excessive. Furthermore, the victim gave the police a description of her assailant *before* seeing the photograph and this description made Officer Talkington suspicious of petitioner because it matched his physical description. The record shows photographs of petitioner which reveal that he had characteristics which would be easily remembered. Finally, as a victim of a rape, the complaining witness was "no casual observer, but rather the victim of one of the most personally humiliating crimes." *Id.* at 200, 93 S.Ct. at 382. As such the victim had a high degree of attention accompanying an excellent opportunity to observe her attacker.

Having concluded that there was little likelihood that the petitioner could have had the victim's in-court identification testimony suppressed under *Biggers,* the next issue to be addressed is whether the failure of the prosecution to inform petitioner of the "single photograph" viewing violated his due process right to be advised of all exculpatory evidence within the possession or knowledge of the State.

*Photo Display as Exculpatory Evidence*

Under *United States v. Brady,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), "the suppression of evidence favorable to an accused upon request violates due process where the evidence is material as to guilt or punishment." *Accord United States v. Steffen,* 641 F.2d 591 (8th Cir. 1981). Petitioner claims that exculpatory evidence is any evidence which "might have affected the outcome of the trial." *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976). Although petitioner quotes accurately, his interpretation of *Agurs* is not entirely correct. In *Agurs* the Supreme Court held that whether evidence had to be disclosed by the prosecution pursuant to *Brady* was to be determined by measuring the character of the evidence itself, that is, whether it was *material* as to guilt or innocence. Three different situations where *Brady* might apply were defined by the Court, and each is to be judged by a different standard of materiality. First, where the prosecution knew or should have known its case included perjured testimony, the standard for materiality is: was there "any reasonable likelihood that the false testimony could have affected the judgment of the jury?" *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397. There is no issue of perjured testimony in the present case. Second, where, as in *Brady,* a pretrial request for specific evidence has been made, the standard for materiality is whether the evidence in question might have affected the outcome of the trial. *Id.* at 104, 96 S.Ct. at 2398. Finally, where a general request or no request is made, the prosecution has a duty to disclose or volunteer only that evidence which "creates a reasonable doubt that did not otherwise exist. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt, whether or not the additional evidence is considered, there is no justification for a new trial." *Id.* at 112–13, 96 S.Ct. at 2402.

■ In the present case, it appears that, at best, petitioner's trial counsel made a general request for exculpatory materials. He filed a Bill of Particulars on what appears to be a standard form. There is no language specifically requesting "exculpatory evidence." There is, however, no significant difference between cases in which a general request has been made and one where no request has been made, because the duty to respond to any request arises not from the fact of the request, but from the exculpatory nature of the particular evidence. Therefore, the applicable standard in the present situation is whether the suppressed evidence creates a reasonable doubt that did not otherwise exist.

■ Applying this standard to the facts contained in the record, this Court finds it unlikely that disclosure of the single photograph identification procedure would have

created a reasonable doubt of petitioner's guilt not otherwise present in the outcome of this case. Petitioner has not made a sufficient showing that he could have used this information to effect a suppression of the victim's in-court identification testimony under the *Biggers* rule. At most then, petitioner could have used the information in an attempt to impeach the victim's testimony. Under those circumstances, petitioner is still required to show that photographic identification evidence in the hands of a skilled counsel would "have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *Lindhorst v. United States,* 658 F.2d 598, 606 (8th Cir.1981) (citations omitted). Given the circumstances of the victim's intense, lengthy visual perception of petitioner at the time of the crime, her prior accurate description of him before seeing the photograph, and the positiveness of all of her identification, this Court finds it unlikely that her viewing of petitioner's photograph could have been developed by petitioner's counsel to the point where it might create the required doubt in the minds of any jurors.

In sum, petitioner has failed to demonstrate that the showing of a single photograph of his likeness to the victim by the police violated his due process rights or that the failure of the prosecution to disclose this evidence also violated those rights. The Court reaches this same conclusion whether the single photograph display was made either intentionally or accidentally.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner's final grounds for his writ of habeas corpus are interrelated. The crux of his argument is that he was denied a right to a fair trial because (1) the prosecutor during voir dire asked prospective jurors if they could give petitioner the maximum sentence of life if the facts warranted it, and (2) the trial court not only failed to instruct the jury that the petitioner was charged with two separate counts of rape requiring separate consideration and separate verdicts by them, but also submitted only one verdict form of guilty or innocent of "rape" even though petitioner was charged, and evidence was offered, on two separate counts of rape. Petitioner presented both of these claims to the Arkansas Supreme Court which declined to reach the merits thereof because petitioner failed to raise the issues at trial by appropriate objections. Petitioner would have this Court reach the merits of these issues by claiming first, that the Arkansas Supreme Court denied him a right of appeal by failing to recognize "plain error" at trial, and second, that no objections were made at trial because petitioner's counsel was ineffective (for failing to object), thus violating his Sixth Amendment rights.

This Court cannot address the merits of petitioner's claims without first determining if it has the authority to do so.

### The Contemporaneous Objection Rule on Habeas Review

■ The Arkansas Supreme Court does not recognize the doctrine of "plain error" and requires that, for an argument for reversal to be considered, an appropriate objection must be made in the trial court. *Wicks v. State,* 270 Ark. 781, 785, 606 S.W.2d 366, 369 (1980). Petitioner complains that this contemporaneous objection rule denies him his right of appeal.

■ Petitioner's argument is without merit. The federal courts have long recognized the right of the states to have a contemporaneous objection rule. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Such a rule encourages accuracy by requiring constitutional claims be made "when the recollections of witnesses are freshest, not years later in a federal habeas proceeding." *Id.* at 88, 97 S.Ct. at 2507. The rule also makes a major contribution to finality in criminal litigation by creating the possibility that the defendant may be acquitted if he is successful in excluding evidence based on his objection or, if convicted, "he will have one less federal constitutional claim to assert in his federal habeas petition". *Id.* at 88–89, 97 S.Ct. at 2507. The contemporaneous objection

rule maintains the integrity of the trial process by discouraging "sandbagging", that is, failure to object by defense counsel hoping for a verdict of not guilty "with the intent to raise their constitutional claims in a federal habeas court if their initial gamble does not pay off." *Id.* at 89, 97 S.Ct. at 2507.

In order for petitioner to overcome the effect of the Arkansas contemporaneous objection rule and obtain federal review of his claims, he bears the burden of making a "showing of cause for noncompliance and some showing of actual prejudice resulting from the alleged constitutional violation." *Id.* at 84, 97 S.Ct. at 2505.

Petitioner argues that his "cause" for failing to make his objections at trial was that his counsel was ineffective, thereby violating his Sixth Amendment rights.

### Ineffective Assistance of Counsel as "Cause"

█ The Court in *Sykes* specifically left open the precise meaning of the term "cause". *Id.* at 91, 97 S.Ct. at 2508. As a result, the lower courts have attempted to formulate their own definition, particularly in the context of allegations of ineffective assistance of counsel where the contemporaneous objection rule is involved. *See Gibson v. Spalding,* 655 F.2d 863 (9th Cir.1981); *Garrison v. McCarthy,* 653 F.2d 374 (9th Cir.1981); *Harris v. Spears,* 606 F.2d 639 (5th Cir.1979); *Collins v. Agur,* 577 F.2d 1107 (8th Cir.1978), *cert. denied,* 439 U.S. 1133, 99 S.Ct. 1057, 59 L.Ed.2d 96 (1979). In those cases, the courts have reasoned that the failure of counsel to object ordinarily can be attributed to either (1) tactical considerations, or (2) inadvertence or ignorance of law. *Garrison,* 653 F.2d at 378. If the failure to object is for tactical reasons, the cause prong of the *Sykes* test cannot be met, unless the defendant can show the tactical decision itself was so incompetently made as to violate his Sixth Amendment right to effective assistance of counsel. To hold otherwise would be to allow the "deliberate bypass" of state procedural rules or the "sandbagging" prohibited in both *Fay*

*v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), and *Sykes.* In contrast, where the failure to object stems from attorney inadvertence or ignorance of law, a lesser showing of incompetency of counsel has been held sufficient to prove cause. *Garrison,* 653 F.2d at 378; *Collins v. Agur,* 577 F.2d at 1110 n. 2.

That standard, however, no longer appears viable in light of the ruling by the United States Supreme Court in *Engle v. Issac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).

In the *Engle* case the Supreme Court stated:

> Every trial presents a myriad of possible claims. Counsel might have overlooked or chosen to omit respondents' due process argument while pursuing other avenues of defense. We have long recognized, however, that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim. Where the basis of a constitutional claim is available, and other defense counsel have perceived and litigated that claim, the demands of comity and finality counsel against labelling alleged unawareness of the objection as cause for a procedural default.

> *Id.* 102 S.Ct. at 1574–75 (footnote omitted)

The Eighth Circuit Court of Appeals has interpreted *Engle* literally in circumstances where a habeas petitioner argues that his failure to object to a particular matter at trial was a result of his counsel's unawareness of the constitutional grounds for the objection. In those cases, the district court must determine if "there was then available the basis for a constitutional claim and whether other defense counsel had perceived and litigated that claim." *Dietz v. Solem,* 677 F.2d 672, 675 (8th Cir.1982).

In the *Dietz* case, as well as in the *Engle* case, however, the ineffective assistance of counsel argument was not raised as the basis for counsel's failure to object. Those

cases addressed the "unawareness" by counsel of the grounds for objection as "cause" for his failure to object. Therefore, where the "cause" for counsel's failure to object is based on his "unawareness" *due to his ineffectiveness under the Sixth Amendment,* the *Engle* analysis is not directly applicable, and some further inquiry is required.

This Court finds the following to be the proper analysis that should be followed when determining if it should hear the merits of a habeas petitioner's claim when the state's highest court has refused to hear that claim because of a procedural default at trial.

■ The habeas petitioner can present his claim for overcoming the obstacle of procedural default in two ways. First, he can argue that, although his counsel was generally effective, his counsel's failure to object at trial was "for cause". For this approach, the petitioner must prove "cause" by showing that his counsel's decision was not made for tactical reasons, but that counsel was "unaware" of the ground or grounds for making an objection. *See Garrison, supra.* The court must then determine if the basis for making the objection was available and if the claim had been perceived and litigated by other counsel. *See Engle* and *Dietz, supra.* If the court finds in the affirmative, it must decline to review the merits of the petitioner's claim despite the allegation of counsel's personal "unawareness". If, however, the claim was neither available nor perceived and litigated by other counsel (i.e. the claim was new or novel), the "unawareness" of counsel would probably reach the required level to meet the "cause" prong of the *Sykes* test. *See Engle,* 102 S.Ct. at 1573 & n. 37. Thus, the key to this approach turns on the claim itself, and its novelty.

■ The second approach that a habeas petitioner can take to surmount the state procedural default and have the federal court address the merits of his claim is to argue that the "cause" for the failure to object at trial was due to the ineffective assistance of the petitioner's counsel. To carry his burden on this route if his counsel's decision not to object was for tactical reasons, the petitioner must show that the tactical decision itself constituted attorney incompetence. Likewise, if the decision was made because of alleged "unawareness" or "inadvertence" of counsel, the proper inquiry is whether the "unawareness" was the result of attorney incompetence. In short, the petitioner must prove that his counsel's decision, made for either tactical or "unawareness" reasons, was so egregious that it reached the level of a Sixth Amendment violation of the right to effective assistance of counsel. A Sixth Amendment analysis would then apply. The Court sees the above analysis as the only reasonable interpretation of the law after *Engle.* *See* Note, *The Supreme Court, 1981 Term,* 96 Harv.L.Rev. 225–26 (1982).

Perhaps a simple set of hypotheticals will clarify the analysis. In a state adhering to the contemporaneous objection rule, assume that it is unequivocally certain that a confession made by the defendant should be suppressed as a matter of law (e.g. it was physically beaten out of him). Defendant's counsel, for unknown reasons, is unaware of the well-settled basis for objecting to the introduction of the confession and so fails to object. Under *Engle* the federal court could not reach the merits of petitioner's claim of constitutional violation for the introduction of the confession because the basis for the objection to such a confession is clearly available and the claim has been perceived and litigated by other counsel, and in fact is settled as a matter of law. But, if the petitioner's basis for cause for the failure to object is premised on ineffective assistance of counsel, this failure is so egregious as to demonstrate attorney incompetence, thereby meeting the "cause" prong of the *Sykes'* test.

Consider the converse situation: The day following a guilty verdict in the petitioner's trial, the United States Supreme Court creates a law of constitutional dimension relevant to the suppression of certain evidence and applies it retroactively. No counsel had ever perceived or litigated this claim

before. Because the law was unknown at the time of the defendant's trial, his counsel could not be found ineffective for failing to object to the introduction of evidence deemed suppressible under the new rule. Therefore, the ineffective assistance of counsel argument would be fruitless to overcome the petitioner's procedural default. Under *Engle,* however, the procedural default would probably be overcome, assuming prejudice was shown, because the new rule was heretofore unavailable and had not been perceived or litigated by other counsel.

 These hypotheticals serve the purpose of demonstrating that by allowing procedural defaults in habeas cases to be analyzed in terms of ineffective assistance of counsel, the contemporaneous objection rule will be treated ·with no less respect than it has been treated under *Sykes* and now after *Engle.* The heavy burden still rests with the petitioner to prove that his counsel was ineffective and that he was prejudiced by that ineffectiveness.

### Ineffectiveness of Counsel Standard Applied to the Facts

The question that this court must now resolve is whether the failure of the defendant's trial counsel to object to the trial judge's failure to instruct the jury that the defendant was being tried on two separate counts of rape and his submission of a single verdict form to them constituted ineffective assistance of counsel. The standard in this circuit for evaluating such claims is found in *United States v. McMillan,* 606 F.2d 245, 247 (8th Cir.1979), in which the court stated:

> In this circuit, the evaluation of a petition alleging ineffective assistance of counsel involves a two-step process. *Rinehart v. Brewer,* 561 F.2d 126 (8th Cir.1977). The petitioner must first show that his attorney failed to exercise the customary skills and diligence that a reasonably competent attorney would exercise under similar circumstances. *United States v. Easter,* 539 F.2d 663, 666 (8th Cir.1976), *cert.*

*denied,* 434 U.S. 844, 98 S.Ct. 145, 54 L.Ed.2d 109 (1977). Second, the petitioner must demonstrate that he was materially prejudiced in the defense of his case by the actions or inactions of his counsel. *Nevels v. Parratt,* 596 F.2d 344 (8th Cir. 1979); *Morrow v. Parratt,* 574 F.2d 411 (8th Cir.1978); *Rinehart v. Brewer, supra.*

Before addressing the ineffective assistance claim directly, however, it is important to set out the factual background in some detail.

The defendant was charged by information with two counts of rape. Count I stated: "On the 17th day of August, 1978, [Wayne Wicks] did unlawfully and feloniously engage in sexual intercourse with a female not his spouse, by forcible compulsion." Count II stated: "On the 26th day of September, 1978, [Wayne Wicks] did unlawfully and feloniously engage in sexual intercourse with a female not his spouse by forcible compulsion." (*See* Record of Petitioner [henceforth "R. of P."] p. 1)

On the first page of the trial transcript (R. of P. p. 287) there appears the following statement:

### COMPLAINT AT LAW

Come Alex G. Street, Prosecuting Attorney within and for Yell County, Arkansas, and here in open court, in the name of, by the authority, and on behalf of the State of Arkansas gives information:

(1) Accusing Wayne Wicks of the crime of rape (Arkansas Statute 41–1803) committed as follows, to wit:

(2) The said Wayne Wicks in County and State as foresaid, COUNT I; On the Seventeenth day of August, 1978, did unlawfully and feloniously engage in sexual intercourse with a female not his spouse, by forcible compulsion.

(3) COUNT II; On the twenty sixth day of September, 1978, did unlawfully and feloniously engage in sexual intercourse with a female not his spouse, by forcible compulsion, against the peace and dignity of the State of Arkansas.

There is no indication from the record whether this statement was read in court or merely used as a preamble to the transcript. The next item in the transcript, however, shows that the judge ordered the clerk to swear the jury to try the case, indicating that they had not been sworn when, and if, the charge was read. The court did not make any opening instructions to the jury and the case proceeded directly to opening statements. The record clearly reflects that the prosecution and the defense viewed the case as containing two separate criminal charges. This is obvious from their express statements and the evidence, proof, and defenses used during the trial. Effort was also made by the prosecution to show the relationship between the two incidents of rape in order to prove that each was committed by the same person.

At the close of the trial, the judge instructed the jury. He gave many of the typical criminal instructions including those on burden of proof and reasonable doubt. When the judge reached the point where he instructed the jury on the charges against the defendant, the following is the sum total of his remarks:

Wayne Wicks was charged with the offense of rape. To sustain this charge, the State must prove the following things beyond a reasonable doubt: First, that Wayne Wicks engaged in sexual intercourse with Joe Ann Watson. Second, that he did so by forcible compulsion. Sexual intercourse means penetration, however slight, of a vagina by a penis. Forcible compulsion means physical force or a threat expressed or implied, death or serious physical injury to or kidnapping of any person. It is the Law of the State of Arkansas that you may convict one charge with rape on the uncorroborated testimony of the prosecuting witness. I turn now to the punishment that may be imposed if you find Wayne Wicks guilty of rape. Rape is punishable by imprisonment in the Arkansas Department of Corrections for not less than five years or more than fifty years or life, or by a fine not exceeding $15,000, or by both imprisonment and a fine. Upon retiring to the Jury Room, you should elect one of you as Foreman who, alone, will sign your verdict. Your verdict must be unanimous, or in other words, all twelve of you must agree on the verdict. You will be given a Verdict Form, which will be as follows, giving you the various verdicts you can render. We, the Jury find Wayne Wicks guilty of rape and fix his sentence at a term of not less than five nor more than fifty years. And you shall determine the term in the Arkansas Department of Corrections or a fine not exceeding $15,000. If that is your verdict, then you should determine the amount of the fine, or both, a term of not less than five nor more than fifty years, or life, to be determined by you, in the Arkansas Department of Corrections and a fine of, not exceeding $15,000. That shall be signed by the Foreman. You also have it on your form, the following: "We, the Jury, find Wayne Wicks, not guilty." And your Foreman will sign that if that be your finding. I will give you a copy of the verdict form upon your retiring. At this time, I believe we are ready for closing arguments.

R. of P. pp. 361–63.

The jury was given a single verdict form which allowed them to either find: "We, the Jury, find Wayne Wicks, guilty of Rape, and fix his sentence at: [followed by provisions for sentence]," or "We, the Jury, find Wayne Wicks not Guilty." (R. of P. p. 12). The jury foreman signed the portion of the verdict form signifying guilty and the jury fixed sentence by filling in the word "life" in the appropriate blank. The judgment entered on March 15, 1979 stated that the verdict returned was: "We, the Jury, find Wayne Wicks, guilty of Rape, and fix his sentence at: A term of Life in the Arkansas Department of Corrections." (R. of P. p. 13).

From these facts, it is clear that the trial judge failed entirely to inform and instruct the jury (1) that the defendant was charged with two separate crimes of rape, (2) that they were to consider each count separately as independent crimes and (3) that they

were to render a separate verdict on each count. What the trial judge did was to inform and instruct the jury that the defendant was accused of "rape" and to give them one verdict form requiring them to find the defendant either "guilty" or "nct guilty" of "rape".

The defendant's trial counsel, Mr. Irwin, was questioned about these instructions and the verdict form at the hearing held before Magistrate Faulkner. Mr. Irwin recalled that the information "charged a first degree rape, I believe, on two separate occasions." (Tr. p. 17). He stated that he put on defenses to both rapes and had specific rebuttal evidence for one rape in particular. *Id.* When asked about what was in his mind when the judge instructed the jury in the singular (i.e. rape instead of rapes), Mr. Irwin responded:

> I cannot honestly recall whether I made a conscious choice, or not, not to object. I'm going to say probably that I will just consider it a rape case and did not make any conscious choice one way or the other, is probably what I did. That's about as well as I can say it. (Tr. p. 19)

The colloquy between Mr. Irwin and defendant's appellate counsel, Mr. Newcomb, then continued:

> Q Now, the verdict form and the jury instruction in this case was used by Judge Eddy, was that prepared by you, the Prosecutor or the Judge?
>
> A My recollection is, it was prepared by the Judge. I don't think I prepared it.
>
> Q Was it Judge Eddy's practice to prepare his own jury instructions, unless there was a specific one requested by you? Well, this was also before the Arkansas Model Instructions, too.
>
> A I don't believe it's his practice. And when I said I think he prepared it, I did not prepare the verdict form. I saw the verdict form; I did not object to the verdict form. But I did not prepare it, and I don't recall Mr. Shelton preparing it. (*Id.*)

On the cross-examination of this issue, the following took place between Mr. McNair, for the state, and Mr. Irwin:

> Q Returning to the single verdict form, if we may, Mr. Irwin, as a matter of practice, both sides were given the opportunity to submit instructions and verdict forms?
>
> A Right.
>
> Q And you testified on direct that you did not submit either of these?
>
> A I did not submit the verdict forms, and I am not—my recollection, I am not sure about the instructions. I will put it that way. I didn't object to him giving any instruction that was pertaining to the verdict.
>
> Q You knew what was going to be an instruction?
>
> A I knew the instruction was going to be to the offense of rape. I don't have any recollection of why I didn't object to one instruction or one verdict form. I don't have any recollection of whether that was a conscious act on my part or not.
>
> Q Would you agree that an attorney could make a conscious decision that a general verdict form could have been a tactically wise choice to make when your client was charged with two counts?
>
> MR. NEWCOMB: Objection. It has no relevance to this case. He says he can't state why he didn't object. The relevant question is whether it pertains to him, not what some other defense counsel may or may not have done as a decision.
>
> MR. McNAIR: I will withdraw my question.
>
> THE COURT: I will sustain the objection.
>
> Q (BY MR. McNAIR) Would you agree that had two separate verdict forms been submitted to the jury, that your client possibly could have been convicted of two separate counts?
>
> A Well, it's possible that he could have. And it's also possible he would have been found not guilty on one count and guilty on the other count, but it's possible he could have been found guilty on both counts.

(Tr. pp. 26–28)

From the foregoing testimony of Mr. Irwin, and the record as a whole, this Court finds that Mr. Irwin's failure to object to the jury instructions and the single verdict form was not likely done for tactical reasons. First, Mr. Irwin could not recall why he didn't object. Second, although it is engaging in speculation, the Court finds little, if any, solid tactical reason for not objecting to the instructions and verdict form.

One possible tactical reason for not objecting was that the defendant might receive but one sentence for the crime of rape, rather than two sentences, one for each count. The only other reason would be to "sandbag", that is, use the error as a basis for appeal. The latter is spurious because of the Arkansas contemporaneous objection rule. The former reason is also weak for at least two reasons: (1) despite its instructions, the trial court might have chosen to interpret the guilty verdict as one on the indictment as a whole, which included two counts, and sentenced the defendant on both, (2) if two verdict forms were submitted and the defendant were found guilty on both counts, it is not unlikely that the sentences imposed might have been made concurrent anyway.

Nevertheless, not only is this type of speculation unwarranted because there is no clear evidence that the failure to object was for tactical reasons, but also the Court finds that, even assuming the decision was tactical, it would have been so egregious an error by counsel as to constitute a Sixth Amendment violation. In light of the evidence, it appears more likely that the failure to object was due to inadvertence or unawareness, and that that inadvertence constituted a Sixth Amendment violation.

Returning to the two-part test for an "ineffective assistance of counsel" claim, the first step requires this court to determine whether Mr. Irwin's failure to object to the jury instructions and the verdict form constituted a "failure to exercise the customary skills and diligence that a reasonably competent attorney would exercise under similar circumstances." *McMillan,*

606 F.2d at 247. In order to answer that question, the Court must first determine what a reasonably competent attorney would know with respect to the law regarding verdicts on multiple-count indictments. In making this determination, the Court will also highlight the prejudice that befalls a defendant when his attorney allows his client's case to go to the jury without instructions to consider each count of a multiple-count indictment separately and to render a separate verdict on each count.

The rule of law is unambiguous that where an indictment or information charges separate and distinct offenses in several counts, the jury must consider the defendant's guilt or innocence as to each count separately and render a separate verdict on each count. *United States v. Dunn,* 564 F.2d 348, 360 (9th Cir.1977) ("the law is uniform . . . as to multiple counts against a single defendant, each count is to be considered separately" (footnote omitted)); *United States v. Robinson,* 545 F.2d 301, 304 (3d Cir.1976) ("jury must consider the defendant's guilt or innocence as to each count of the indictment separately"); *United States v. McGrady,* 508 F.2d 13, 21 (8th Cir.1974) ("where there are separate counts in an indictment, there must be separate verdicts by the jury as to the guilt or innocence of each defendant on each count"); *Glenn v. United States,* 420 F.2d 1323, 1324–25 (D.C.Cir.1969) (general verdict which failed to specify whether it related to one or both counts held "unalterably ambiguous"); *United States v. Schmidt,* 376 F.2d 751, 755 (4th Cir.1967), *cert. denied,* 389 U.S. 884, 88 S.Ct. 158, 19 L.Ed.2d 183 (1967) (where general verdict was returned, court stated that the "invalidity of defendant's conviction rests in the fact that it cannot be determined of which count defendant was found guilty . . . [or] . . . not guilty"); *United States v. Di Matteo,* 169 F.2d 798, 800 (3d Cir.1948) ("The charge of the learned judge was insufficient in that he did not direct the jury to return a verdict on each count of the indictment"); *United States v. Crescent-Kelvan Co.,* 164 F.2d 582, 589 (3d Cir.1948) ("where there are separate

counts in an indictment or information, there must be separate verdicts by the jury ..."); *United States v. Mazzoncini,* 31 F.2d 289 (9th Cir.1929) ("It was the duty of the jury to return a verdict on each count..."); *United States v. Kilroy,* 523 F.Supp. 206, 210 (E.D.Wisc.1981) ("the jury must consider the evidence separately as to each count and reach a separate verdict as to each.") *See also* 2 Blackmar & Devitt, *Federal Jury Practice and Procedure,* 11.07 (3d Ed.1977).

In petitioner's case, he was charged in the information with two counts of rape. Each count was for a separate commission of rape and the evidence and proof at trial went to the separate offenses. Therefore, the counts were for separate and distinct offenses, each being subject to a separate sentence, even though both offenses were of the same character and involved the same victim. In *Conley v. State,* 270 Ark. 886, 891, 607 S.W.2d 328, 331 (1980), the Arkansas Supreme Court upheld the imposition of consecutive sentences imposed on the defendant and in doing so specifically found that separate acts of rape constitute separate and distinct offenses, each subject to a separate sentence. *See also Commonwealth v. Jones,* 274 Pa.Super. 162, 418 A.2d 346 (1980), *cert. denied sub nom. Jones v. Penn,* 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1980) (each rape constitutes a separate offense); *People v. Smith,* 14 Mich.App. 502, 165 N.W.2d 640 (1969) (With respect to multiple counts of rape, the court stated: "When an information contains more than one count, the verdict must specify of which offense the defendant is guilty."); *State v. Wilson,* 162 S.C. 413, 161 S.E. 104 (1931) (finding separate rapes to be separate offenses, but upholding general verdict of guilty because the language of the verdict, read in light of the court's specific instructions as to each count, made it clear that the general verdict covered each count); *Shell v. State,* 38 S.W. 207 (1896) (The court held that intent to rape the victim on the one hand, and intent to rape the victim who was 15 years of age on the other hand, were two separate offenses, therefore, a general verdict of guilty was insufficient since it could not be determined upon which count the defendant was convicted.)

The Court is aware of a number of older cases which seem to hold that a general verdict on an indictment containing several counts is equivalent to a verdict of guilty as to each and every count. *See, e.g., Phillips v. United States,* 264 F.2d 657, 659 (5th Cir.1920). A careful reading and analysis of those cases demonstrates that they are not only misleading, because quoted out of context, but are actually supportive of the rule requiring separate verdicts on separate indictments.

One of the earliest United States Supreme Court cases to state the proposition in its general form was *Ballew v. United States,* 160 U.S. 187, 197, 16 S.Ct. 263, 267, 40 L.Ed. 388 (1895). There the Court stated:

The verdict was a general verdict. That in a case such as this a general verdict is proper and imports of necessity a conviction as to both crimes, is settled.

*Id.* (citing *Claassen v. United States,* 142 U.S. 140, 146, 12 S.Ct. 169, 170, 35 L.Ed. 966 (1891)). But, the Supreme Court also noted how the general verdict came about at the trial of the case.

The court instructed the jury that if they considered the defendant guilty on one count and innocent on the other, they should so find; and if they found him guilty on both counts, that they should return a general verdict of guilty. The last was the verdict returned.

*Ballew,* 160 U.S. at 191, 16 S.Ct. at 264.

In *Ballew* it is clear that although the jury returned a single verdict of guilty on the whole indictment, they were instructed to consider each count separately and were told to return the general verdict only if they found the defendant guilty on all counts.

In the *Claassen* case, which was relied upon in *Ballew,* the Supreme Court stated the law as follows:

And it is settled law in this court, and in this country generally, that in any crimi-

nal case a general verdict and judgment on an indictment or information containing several counts cannot be reversed on error, if any one of the counts is good and warrants the judgment, because in the absence of anything in the record to show the contrary, the presumption of law is that the court awarded sentence on the good count only.

*Claassen,* 142 U.S. at 146–47, 12 S.Ct. at 170 (citations omitted).

The Court's general statement, however, must again be read in light of the facts. As the Court also stated:

At the trial the district attorney elected to go to the jury upon eleven of the counts; and on May 28, 1890, the jury found the defendant guilty of the offenses charged in five of those counts, and acquitted him upon the other six.

*Id.* at 141, 12 S.Ct. at 169.

Clearly, the jury had not rendered a general verdict on the indictment alone, but had rendered a decision on each count, though it could be said technically that the defendant was judged guilty on the indictment.

In 1936, the Supreme Court made it unequivocal that the rule of law is "that a judgment upon an indictment containing several counts, *with a verdict of guilty on each,* will be sustained if any count is good, and sufficient in itself to support the judgment." *Whitfield v. Ohio,* 297 U.S. 431, 438, 56 S.Ct. 532, 534, 80 L.Ed. 778 (1936) (citing *Claassen*) (emphasis added). By implication, where the jury does not consider each count separately and render separate verdicts on each, the reviewing court can not uphold a single general verdict on the indictment as a whole because the court would be unable to determine upon which count the jury convicted or if the jury considered each count separately.

The concern of the Supreme Court in the *Claassen* type of cases has not been single general verdicts in multiple-count indictments where the counts were not considered individually, but rather the situation where there has been judgment on the indictment, each count individually considered, the defendant found guilty on a number of counts, and the argument raised that one or more of the counts did not merit the verdict. Because each count constitutes a separate offense, the rule in *Whitfield* makes sense, because the Court assumes that the jury followed proper instructions and that each count was assessed separately. As long as one count is good, and the sentence imposed does not exceed that for the good count, then the verdict on the indictment is good. *See Whitfield,* 297 U.S. at 438, 56 S.Ct. at 534. Because each count must set out the offense in full, the multiple-count indictment is virtually identical in substance to a multiple-indictment, and for the latter where they are joined in the same trial, if a verdict is insufficient on one indictment, it has no bearing on the verdict in the other, provided that sentencing was made without consideration of the insufficient indictment. *See Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932) ("Each count in an indictment is regarded as if it were a separate indictment.")

In sum, this Court finds that this line of cases is in complete accord with those appellate court cases discussed *supra* which require either separate verdicts be rendered for each count in an indictment, or a general verdict where it is clear in light of the court's instructions that that verdict expressly applies to each count.

This Court finds further support for the rule of separate verdicts for each count in another seemingly contradictory line of Supreme Court cases beginning with *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). Those cases stand for the rule "which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Yates v. United States,* 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957) (citations omitted). In *Street v. New York,* 394 U.S. 576, 588, 89 S.Ct. 1354, 1363, 22 L.Ed.2d 572 (1969), the Court stated:

When a single-count indictment or information charges the commission of a crime

by virtue of the defendant's having done both a constitutionally protected act and one which may be unprotected, and a guilty verdict ensues without elucidation, there is an unacceptable danger that the trier of fact will have regarded the two acts as "intertwined" and have rested the conviction on both together.

It is highly noteworthy that the Court then stated:

> There is no comparable hazard when the indictment or information is in several counts *and the conviction is explicitly declared to rest on findings of guilt on certain of those counts,* for in such instances, *there is positive evidence that the trier of fact considered each count on its own merits and separately from the others.*

*Id.* (footnote omitted citing *Claassen inter alia* ) (emphasis added)

At first blush, this line of cases would seem to imply that where a verdict *is* constitutionally or legally supportable on *both* of two grounds, though it cannot be determined upon which, then a single general verdict on an indictment would stand. This court finds, however, that there is a distinction between several alternative illegal acts set out in a single count indictment, and several illegal acts set out as separate counts in a multiple-count indictment. *See id.* The *Stromberg*-type cases arise in the context of a single-count indictment alleging multiple "acts" by which the single offense charged in the indictment was committed. If any of the alleged "acts" are not invalidly or unconstitutionally contained in the indictment, then a single general verdict on it can be sustained without concern over which "act" was considered the one constituting the offense, provided each of the "acts" is an alternative and not a necessary means of committing that offense. It follows logically then that if an "act" included in the indictment is invalid or unconstitutional, absent clear indication of the "act" relied upon by the jury, it is impossible to determine which "act" was actually relied upon in rendering the single verdict on the offense, or the indictment as a whole. Thus, an inquiry into whether a particular "act" is permissibly included in the single-count indictment is always warranted.

In the case of a multiple-count indictment, such as in the *Claassen* line of cases, discussed *supra,* the reverse is true. *If a* verdict is returned on each count, each stands alone as a separate offense and there is no problem determining on which counts or "acts" the jury convicted, even if the ultimate judgment itself is on the indictment as a whole. Thus, if one count or "act" supports conviction on the indictment, the indictment stands and the judgment is good despite the fact that other counts may later fall upon appellate review.

A single verdict rendered in a multiple-count indictment without any indication by the jury of guilt as to the individual counts represents a situation which lies precisely in the hairsbreadth distance between the points of express law stated in the *Stromberg* and the *Claassen* lines of cases. This situation is neither one of a single, general verdict on a single offense indictment alleging multiple acts, nor a single, general verdict on a single indictment alleging multiple counts, or offenses where separate consideration and determination of guilt was required and was given by the jury. The express rules of *Stromberg* and *Claassen* therefore do not apply. What does apply here is the common principle that controls both lines of cases: whether it is possible to determine upon which "act" or count the jury based its verdict. Applying that principle (in lieu of attempting to speculate as to whether the jury found the evidence sufficient to find the defendant guilty on all counts) is the correct legal approach from both the standpoint of the proper role of a reviewing court and of the Constitution.

There are significant reasons for holding that separate counts require separate consideration and separate verdicts. Those reasons focus on the function of the reviewing court, the dangers inherent in the joinder of similar offenses in one indictment, the integrity of the trial process, the re-

quirement that the government prove each count beyond a reasonable doubt, the prevention of double jeopardy, and the avoidance of conviction by a verdict that is less than unanimous.

■■■■ It is a sound and well justified rule of appellate law that a reviewing court must not speculate on the decision-making process of the jury. Just as a proper verdict cannot be upset by speculation of inquiry into how the jury arrived at its decision, *Dunn v. United States,* 284 U.S. 390, 394, 52 S.Ct. 189, 191, 76 L.Ed. 356 (1932), an improper verdict cannot be cured by employing the same speculation. *See Stromberg supra.* Even if the reviewing court in a single, general verdict case were to conclude that the evidence supports conviction on all counts, the jury itself might have concluded for reasons known only to it, that the defendant had not committed one of the offenses charged in one or more of the counts. As is often pointed out, juries are free to render verdicts that are even inconsistent or the result of mistake, compromise or compassion. *See, e.g., United States v. Lichenstein,* 610 F.2d 1272 (5th Cir.), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980).

Another reason for requiring separate verdicts for separate counts is that although separate crimes of the same or similar character may be tried together in the same indictment as separate counts (*see* Ark.R.Crim.P. 21.1(a)), the court must be cognizant of the potential of cross-count prejudice that may result. The prejudice to which the defendant might be subjected where offenses were joined because of the same or similar character was summarized in *United States v. Foutz,* 540 F.2d 733, 736 (4th Cir.1976) (footnote omitted), in which the court stated:

> [T]hree sources of prejudice are possible... (1) the jury may confuse and cumulate the evidence, and convict the defendant of one or both crimes when it would not convict him of either if it could keep the evidence properly segregated; (2) the defendant may be confounded in presenting defenses, as where he desires to assert his privilege against self-incrimination with respect to one crime but not the other; or (3) the jury may conclude that the defendant is guilty of one crime and then find him guilty of the other because of his criminal disposition.

In the instant case there is no claim of improper joinder or cross-count prejudice, but the absence of such a claim does not diminish its relevance under the circumstances of this case.

The principal protection for the defendant being tried for multiple offenses of the same type is the requirement that, although proof and evidence used in one count may sometimes be used in the other, *Drew v. United States,* 331 F.2d 85, 90 (D.C.Cir. 1964), ultimately, each count must be treated as a separate offense with the government shouldering the burden of proving each count beyond a reasonable doubt. Without the judge instructing the jury to consider each count separately and to render a separate verdict on each, the defendant's protection from cross-count prejudice vanishes. Although the court in the *Drew* case found that while there is generally no prejudicial effect from the joinder where evidence of each crime is simple and distinct, it also stated:

> This rests upon the assumption that, *with a proper charge,* the jury can easily keep such evidence separate in their deliberations and, therefore, the danger of the jury's cumulating the evidence is substantially reduced.

*Drew,* 331 F.2d at 91 (emphasis added).

■■■■ In this same regard, the most fundamental aspect of criminal justice and the integrity of the truth-finding function of the judicial system is placed in jeopardy when separate verdicts are not required for separate counts in an indictment. It is axiomatic that the government bears the burden of proving beyond a reasonable doubt *as to each offense charged,* each and every element of that offense including the fact that a crime was committed and that the defendant committed it. *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1969). By failing to instruct the jury to

consider each count separately and to render a separate verdict on each count, the government is effectively relieved of its burden. By using only one verdict form, the possible result can be a jury decision for conviction whereas if there are two forms along with proper instructions a hung jury would result from the same voting position of each juror. In other words, assume six jurors believed the defendant "guilty" on count one and "not guilty" on count two, while the other six jurors believed just the reverse. Upon a proper submission of separate verdict forms the defendant would not have been convicted on either count. But when the jury is asked simply, "Did the defendant rape the victim?", all twelve jurors might be willing to agree that he did. Therefore, the government avoids its burden of proving the defendant guilty on each offense charged.

■■■ Where separate counts charging separate but identical crimes are contained in one indictment and the jury is not instructed to consider each count separately and render separate counts on each, but is instructed to render a verdict on the defendant's culpability for "the crime", the indictment becomes *de facto* "duplicitous." In effect, there has been "the joining of a single count of two or more distinct and separate offenses." *Gerberding v. United States,* 471 F.2d 55, 59 (8th Cir.1973) (citing Wright, *Federal Practice and Procedure,* § 142, p. 306 (1969 ed.) (defining duplicity)). In the instant case the defendant was charged with two separate rapes, yet the judge turned the case over to the jury charging them to render a verdict on whether the defendant "was guilty of rape." Though the indictment was not duplicitous, the judge's instructions made it so. *Cf. Franklin v. United States,* 330 F.2d 205, 206 (D.C.Cir.1964) (indicating that four rapes charged in a single count indictment would be duplicitous, although the verdict cured the defect in that case).

The vice of duplicity was summarized succinctly in the case of *United States v. Starks,* 515 F.2d 112, 116–17 (3d Cir.1975), *aff'd in part, rev'd in part on other grounds,* *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), in which the court stated:

> One vice of duplicity is that a general verdict for a defendant on that count does not reveal whether the jury found him not guilty of one crime or not guilty of both. Conceivably this could prejudice the defendant in protecting himself against double jeopardy. Another vice of duplicity is that a general verdict of guilty does not disclose whether the jury found the defendant guilty of one crime or both. Conceivably, this could prejudice the defendant in sentencing and in obtaining appellate review. A third vice of duplicity is that it may prejudice the defendant with respect to evidentiary rulings during the trial, since evidence admissible on one offense might be inadmissible on the other. Finally, there is no way of knowing with a general verdict on two separate offenses joined in a single count whether the jury was unanimous with respect to either.

*See also United States v. Pavloski,* 574 F.2d 933, 936 (7th Cir.1978).

This court concludes that the same constitutional infirmities inherent in a duplicitous indictment are also inherent in this situation where there is a single, general verdict on a multiple-count indictment. This is because the actual effect on the defendant is the same in both instances, and because of the nature of the single verdict itself.

In the final analysis, there is but one constitutionally acceptable rule in this circumstance. Where a defendant is found guilty by a single general verdict on a multiple-count indictment charging separate and distinct offenses in each count, there is no way on the face of the record to determine if he was found guilty on all counts or only some or none, the court must reverse the judgment. To paraphrase the words of the United States Supreme Court, to say that a general verdict of guilty should be upheld though we cannot know upon which counts in the indictment it rests, if any, would be to countenance a procedure which would cause a serious impairment of consti-

tutional rights. *See Williams v. North Carolina,* 317 U.S. 287, at 292, 63 S.Ct. 207 at 210, 87 L.Ed. 279.

## CONCLUSION

■ From the foregoing analysis, the Court concludes that the failure of petitioner's counsel to object to both the verdict form and the trial judge's failure to properly instruct the jury on both counts of the information and upon their duty to consider each count separately and render a separate verdict on each was so egregious as to deprive the petitioner of his Sixth Amendment right to the effective assistance of counsel. The law is clear and a reasonably competent attorney would have known under these circumstances that a separate verdict on each of the rape counts was required in order to protect the petitioner's basic constitutional rights. The rights protected by the rule requiring separate verdicts on separate counts are fundamental and the petitioner was substantially and actually prejudiced by his counsel's failure to object to the instructions and verdict form. First, the government was effectively relieved of its burden of proving the petitioner guilty beyond a reasonable doubt for each and every element of each of the *crimes charged.* Second, neither the petitioner nor the court has any way of knowing of which offenses the petitioner was convicted or perhaps acquitted thereby leaving open the possibility of double jeopardy. Third, there is no way to determine upon which count or counts the jury found the petitioner guilty, thereby leaving the reviewing court nothing but speculation as to the jury's decision. Fourth, the ambiguous verdict makes it impossible to determine upon which count or counts sentence was imposed. Fifth, there was a denial of a fair jury trial because, without instructions and a verdict form requiring the jury to consider each count separately and render a separate verdict on each, there was a substantial opportunity to confuse and cumulate the evidence and there was also the possibility that the petitioner was convicted by less than a unanimous verdict. Finally, and perhaps most important, the very integrity of the criminal trial process is undermined by allowing a general verdict on a multiple-count indictment or information: in the end neither the defendant nor society can say *upon which crime, if any, the defendant was convicted.*

The court recognizes that its ruling tends to weaken the effectiveness of the Arkansas contemporaneous objection rule by finding that the "cause" for petitioner's failure to object at trial was attorney's ineffectiveness. But let it be pointed out again, that although the state has a right to have its rule upheld, the defendant has an equal, and perhaps greater right, to the effective assistance of his counsel. This is not to say that every failure of an attorney to raise an objection to trial can be found to constitute ineffectiveness. On the contrary, not only must the particular failure to object be so egregious as to constitute ineffectiveness, but also, just as required in *Sykes,* the failure to object must materially prejudice the defendant. The standard is difficult to meet, but the petitioner has done so in these rather particular and unusual circumstances. The existence of the very few cases in which a single, general verdict on a multiple-count indictment was at issue attest to both the rarity of this type of case, and the egregiousness of not having separate count verdicts on the separate counts of a multiple-count indictment.

In the final analysis, it is no argument that the evidence would support a conviction on each count or that the defendant was found guilty of "rape". He was charged and tried for two very serious crimes and yet no one can know for which crime, or crimes, the jury, by unanimous decision, found him guilty.

■ With respect to the petitioner's claim of ineffective assistance of counsel because his counsel failed to object to the prosecution's questions on *voir dire* regarding the beliefs of the potential jurors as to whether they could impose the maximum sentence of life if they found the petitioner guilty, the Court finds no merit. Not only did the petitioner's counsel fail to object to this line of questioning, he actively pursued

**568**

it himself, possibly in order to identify those jurors who were reluctant to impose a life sentence since he may have considered them to be potentially favorable toward his client at sentencing if he were found guilty. Furthermore, although forcing a prospective juror to commit himself to imposing the maximum sentence if the defendant is found guilty is reversible error, *Haynes v. State,* 270 Ark. 685, 606 S.W.2d 563 (1980), merely asking the prospective juror if he can consider the entire range of sentences, including the maximum, is not impermissible. *Sanders v. State,* 274 Ark. 525, 626 S.W.2d 366, 367 (1982).

Accordingly, the Court finds that the petition for habeas corpus must be granted on the ground that the defendant was deprived of his Sixth Amendment right to the effective assistance of counsel. The Court will therefore set aside the conviction of Mr. Wicks and direct the respondent, within 90 days, to retry him or to set him free.

It is so Ordered.